# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

NORMA SANCHEZ,

       Plaintiff,

v.                                      No. CIV 03-470 LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Norma Sanchez ("Sanchez") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Sanchez was not eligible for disability insurance benefits ("DIB") or Supplemental Security Income ("SSI"). Sanchez moves this Court for an order reversing for payment of benefits, or alternatively remanding for a rehearing. [Doc. 12.]

Sanchez was born on April 24, 1970 and was 32 years old when the second administrative hearing was held. She completed the 9th grade when she dropped out to have her first of two children. [Tr. at 37, 331.] She has past relevant work experience as a manager of a pizza restaurant, a waitress and a motel maid. [Tr. at 18-19, 246.] She has never been married and is raising two boys who are in their teenage years now. [Tr. at 332.] Since late 1999, Sanchez has been able to work as a waitress at the Buckhorn Tavern. [Tr. at 333.] She amended her application for benefits for a

closed period of time, beginning August 15, 1996 and ending October 1999, when she returned to work.  [Tr. at 331.]

This case has been ongoing for eight years.  Sanchez had two administrative hearings, both conducted by ALJ Gary L. Vanderhoof.  He authored two decisions, both denying her requests for benefits.  In August 1996, Sanchez applied for SSI and DIB.  [Tr. at 82, 224.] She alleged an onset date of July 31, 1996, after she had sustained a closed head injury with a basilar skull fracture in a motor vehicle accident in December 1995.  [Tr. at 125, 127, 130.]  At the time of the accident, Sanchez apparently had been drinking and/or using cocaine although she claimed that she rarely used alcohol or drugs.  [Tr. at 132.]  There was no objective medical evidence presented to show that Sanchez was a regular user of alcohol or drugs.

On October 24, 1997, ALJ Vanderhoof held the first administrative hearing, during which Sanchez was represented.  After her attorney asked Sanchez a number of questions, the ALJ concluded the hearing without any additional questioning or the use of a VE.  [Tr. at 65.]  On December 16, 1997,  Judge Vanderhoof denied Sanchez's application for disability benefits.  He concluded in part, that Sanchez quit her job in July 1996, not due to health reasons but because the pizza business closed.  [Tr. at 19.]  He also found at Step 2 of the sequential process that Sanchez did not suffer from a severe mental or psychological disorder during the time under review.  Although Judge Vanderhoof decided that she could not return to her past relevant work, he concluded that she could perform sedentary and light work on a sustained basis.  After applying the grids, the ALJ determined Sanchez was not disabled.  [Tr. at 25, 26.]  On July 14, 1999, almost two years later, the Appeals Council denied Sanchez's request for review.  [Tr. at 6-7.]

On August 14, 2000, Sanchez filed a Motion to Reverse or Remand Administrative Decision that was granted by the United States District Court. [Tr. at 259.] The Court concluded that the ALJ erred at Step 2 of the sequential evaluation process, particularly with respect to his findings that Sanchez's mental/psychological impairments were not severe. "[T]he ALJ's finding that Sanchez' borderline intellectual functioning had not caused any significant functional restrictions is not supported by substantial evidence." [Tr. at 264.] In addition, the Court concluded that based on these findings, the ALJ's reliance on the grids was error. [Tr. at 265.] On August 27, 2001, the case was remanded "for the limited purpose of having the ALJ call a vocational expert and to include Sanchez' mental impairments in his RFC assessment." [Tr. at 266, 269.]

The second hearing was held on January 27, 2003, again before ALJ Vanderhoof. [Tr. at 327.] On March 26, 2003, Judge Vanderhoof issued his second decision denying Sanchez benefits. [Tr. at 245.] The Appeals Council denied Sanchez' request for review. [Doc. No. 15, p. 2.] This appeal followed.

<u>**Standards for Determining Disability**</u>

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

---

[1]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Williams v. Bowen</u>, 844 F.2d 748, 750 (10th Cir. 1988).

[2]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Sorenson v. Bowen</u>, 888 F.2d 706, 710 (10th Cir. 1989).

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[7] age, education and past work experience, she is capable of performing other work.[8] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony might be used to

---

[3] 20 C.F.R. § 404.1520(b) (1999).

[4] 20 C.F.R. § 404.1520(c) (1999).

[5] 20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[6] 20 C.F.R. § 404.1520(e) (1999).

[7] One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[8] 20 C.F.R. § 404.1520(f) (1999).

[9] Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

demonstrate that the plaintiff can perform other jobs in the economy.  Id. at 669-670.  Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category."  Id. at 669 (*relying on* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)).  Non-exertional limitations can include mental impairments.  The grids do not consider non-exertional limitations; therefore, if significant non-exertional limitations are present, the grids may not be applicable.  Id.  However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work."  Id. (internal citations omitted.)  In this case, the ALJ used both the grids and the testimony of a vocational expert in reaching his decision at step five of the analysis.

### Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal

standards were applied.  Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

In accordance with the remand Order, a vocational expert was called to testify at the second hearing, and the ALJ appears to have considered some of Sanchez's nonexertional impairments in his determination of her RFC, although Sanchez argues that the ALJ improperly failed to include all of the nonexertional impairment in the operative hypothetical question posed to the VE. [Doc. No. 13.] Judge Vanderhoof confined his questions at the second hearing to those issues set forth in the district court's remand order. [Tr. at 331.]  After reviewing Sanchez's medical records, symptoms and complaints, and the VE's testimony, Judge Vanderhoof rejected Sanchez's claim for benefits at step 5, after applying the grids.  In reaching this decision, the ALJ made the following findings before utilizing the grids: (1) Sanchez had not engaged in substantial gainful activity during the closed period requested; (2) Sanchez had an impairment or a combination of impairments that were "severe"; (3) the impairments, alone or in combination, did not meet or medically equal one of the listed impairments; (4) Sanchez's allegations regarding her limitations were not totally credible; (5) Sanchez

had an RFC of "a limited range of light work"; (6) she was unable to perform any category of her past relevant work; (7) she was a "younger individual," with a "limited education and had no transferable skills from any past relevant work; (8) Sanchez had the RFC to perform a limited range of light work consistent with the hypothetical question to the VE; and (9) although her exertional limitations did not allow her to perform the full range of light work, there were significant numbers of jobs in the national economy that she could perform. [Tr. at 252-53.] At the fifth step of the sequential analysis, the ALJ used the grids as a framework, in combination with the VE's testimony, and decided that Sanchez was not disabled during the closed period in question. [Tr. at 250-53.]

### Summary of Sanchez's Employment and Medical History

In earlier years, Sanchez worked as a motel maid and a waitress. [Tr. at 97.] In 1991-92, she was a night supervisor for a pizza establishment. From 1992 until July 1996, she worked at Little Caesar's Pizza where she was moved up to assistant manager and finally the manager for her last two years. [Tr. at 41.] She testified that her job there ended because the business closed. [Tr. at 42.] However, she also implied that she may not have been doing as good of a job after her accident and injury in December 1995, which might have contributed to the business' failure. [Tr. at 42.] Sanchez testified that after her accident everything fell apart at work partly perhaps because she had difficulties hearing and because she could not handle the work like she had before the accident and injury. For example, she had difficulty dealing with numbers and the store's inventory after her accident. [Tr. at 43-45.]

Sanchez eventually attempted to pass the G.E.D. or a pre-G.E.D. exam and failed it. [Tr. at 44-45, 332.] In September 1997 in order to support her children, Sanchez started work for a florist shop but she lasted only two weeks in that position. [Tr. at 38.] Sanchez testified that she could not

handle the job with her mood swings, dizziness, fatigue and headaches. [Tr. at 39.] She essentially claims to have been unable to work from July 1996 through October 1999, at which point she felt better and has been able to hold a waitress job at the Buckhorn Tavern since that date. [Tr. at 333.]

There are a few medical records from the 1980's and the early 1990's that do not appear to be of consequence to this matter. [Tr. at 175, 178, 186,188-89.] Sanchez was having some problems with depression in 1994 and an anti-depressant medication was recommended then. [Tr. at 175.] The first significant medical record is dated December 3, 1995, when Sanchez had the car accident resulting in her closed head injury and skull fracture. [Tr. at 125, 127, 130.] Sanchez had been drinking prior to the accident and she tested positive for cocaine. [Tr. at 132.] After the accident, she complained of no hearing in her left ear and significant dizziness. Sanchez felt unbalanced and weaved when she walked. [Tr. at 136.] She was released after several days, and her dizziness seemed to be improving. [Tr. at 135.]

During 1996, Sanchez had very few doctor's appointments although she did see an opthamologist later in the year and was given a new prescription for her glasses which solved her vision problem. [Tr. at 142.] In August 1996, she submitted her applications for SSI and DIB, based on hearing loss in the left ear secondary to head trauma. [Tr. at 82, 224.] In mid-1996, Sanchez stated she was able to do household chores and visit relatives. She was able to drive a car and ride a bike cautiously due to her hearing loss. [Tr. at 92-100.] She also stated that she could get her children ready for school, clean house, make dinner and help with homework. In 1996, Sanchez said she could do all of those things on some days, but not on others. If she bent over or worked a lot, she became dizzy and had headaches. Her mother did her shopping for her then. She tried to do some sit-ups and to ride a bike but her balance was off. [Tr. at 101.] Also, in 1996, Sanchez filled

8

out a dizziness questionnaire and stated that while she had not blacked out then, she head lightheaded and spinning feelings, loss of balance and headaches. She improved when she lay down. [Tr. at 107. She had several telephone conversations with disability staff, during which the staff reported that she seemed to be able to hear on the phone. [Tr. at 110, 111.] She reported dizziness several times per week but was still driving. [Tr. at 110.]

On November 6, 1996, Dr. Gwen Sun performed a consultative exam on Sanchez. Dr. Sun noted that Sanchez could do housekeeping chores, cook, shop and drive her kids around. She was neither depressed nor suicidal. [Tr. at 137.] The loss of hearing in her left ear, however, was permanent. Her overall condition, in Dr. Sun's opinion, was conducive to most activities including work activities, with the exception of strenuous and laborious work. Her ability was intact with average or above intellect. [Tr. at 137.] On December 16, 1996, her underlying disability benefit application was denied. [Tr. at 68.]

In 1997, Sanchez had increasing complaints related to headaches and dizziness and other related problems. In January 1997, she stated on the reconsideration disability report that she felt her condition had worsened due to dizziness and blackouts. [Tr. at 112.] She was having problems with comprehension, memory, depression and suicidal thoughts. She needed help with household chores and she needed to stop and rest more due to dizziness and headaches. She was having mood swings and energy fluctuations. [Tr. at 112.]

On March 10, 1997, Sanchez communicated with disability personnel regarding her application. [Tr. at 116.] The interviewer reported that Sanchez sounded sad but was courteous. Sanchez could not remember things in the past but her recent memory was satisfactory. She had blacked out on one occasion but had not gotten treatment due to lack of finances. She was having

frequent severe headaches that made it difficult for her to concentrate. Ibuprofen helped but if she skipped it, the pain, nausea and dizziness were unbearable. She went to church on some Sundays and tried to attend her boys' sporting activities. If she had a headache, she did not feel like eating. She was not certain she could drive a car then, even if she had one. She occasionally tried to ride a bike but it was difficult due to balance problems. She denied concrete suicidal ideation but felt a compulsion at times to slice herself with a razor when she was shaving her legs. Sanchez reported having no hobbies at this time. [Tr. at 116.]

On April 14, 1997, Sanchez saw her treating physician, Dr. Audrey Vega at the Bhasker Medical Clinic in Socorro. [Tr. at 166.] She reported two episodes of syncope and frequent vertigo. She also informed the doctor that she had a marked amount of light headedness, lift-sided headaches and left hearing loss. She was placed on medication for the dizziness and advised to discontinue the Ibuprofen and start Naproxen.

On May 9, 1997, Sanchez was given a consultative psychological evaluation by Susan Eissele, Ph.D. [Tr. at 144.][10] Dr. Eissele reported that Sanchez was taking Naproxen, Acetaminophen and Lodine for her headaches. Sanchez was having problems with dizziness but was scheduled to begin physical therapy. Sanchez reported increased depression since the accident. She told Dr. Eissele that she was particularly bothered by her crying because she used to be the strong one in her family who took care of her father, brothers and her own sons. She no longer could ride a bike or drive a car for fear of a blackout. She did not attend her sons' activities. She sometimes thought of killing herself. On some days, she was able to perform various household tasks, but on others she could not. She

---

[10]Dr. Eissele's report in the administrative record is an 8-page report that is missing pages 2-5. Plaintiff attached the complete report to her briefing. It is unclear whether the ALJ had the benefit of the complete report.

occasionally played bingo with an uncle and she had a friend and cousin who visited her regularly.

Sanchez's mother drove her to the evaluation with Dr. Eissele. During testing and the interview, Sanchez cried several times. Her speech had "a significant amount of depressive content." Her intelligence, by formal testing, was overall in the borderline range. Her presentation during the interview appeared likely to be in the low average range. Her verbal testing ranged from mentally retarded to low average. Her lowest verbal score was on comprehension, a test of common sense judgment. Sanchez's performance test scores ranged from mentally retarded to high average. She showed some relative difficulty with attention/concentration.

Dr. Eissele attempted to reconcile Sanchez's reports of increased depression on that date with Dr. Sun's evaluation in November 1996, when Sanchez did not report any depression or suicidal thoughts. Dr. Eissele posited that it could be that Sanchez had become increasingly depressed or had not felt open to discussing those problems with Dr. Sun. "Malingering cannot be ruled out on the basis of today's evaluation." Dr. Eissele felt it might be helpful to obtain additional information from family or friends. Dr. Eissele concluded that Sanchez was functioning overall in the borderline range intellectually. However, it seemed to Eissele that a fast food managerial position would require a somewhat higher level of functioning. Dr. Eissele did not know whether Sanchez's complaints were related to her head injury or a result of anxiety and depression related to Sanchez's concerns about her physical status and her ability to care for her sons. [Doc. No. 13, full report attached.]

On May 12, 1997, Dr. Vega wrote a letter to HSD on behalf of Sanchez stating that Sanchez was currently unable to work because of significant headaches and cognitive deficits after her fracture. She was being treated for her headaches and would undergo further testing regarding

cognitive function loss. Dr. Vega opined that Sanchez was definitely temporarily disabled until she was headache free.[11] [Tr. at 165.]

On May 14, 1997, Dr. Chiang performed a mental RFC assessment. [Tr. at 195, 205.] Her diagnosis was adjustment disorder with mixed emotional features and borderline intellectual functioning. [Tr. at 195.] Sanchez's impairment was moderate. Sanchez was moderately limited in her ability to complete a normal work day without interruptions from psychologically based symptoms but was rated in most categories to be not significantly limited. She was capable of simple, routine work. [Tr. at 207.]

On July 1, 1997, Dr. Vega's notes indicate Sanchez had persistent headaches and was consuming 2400 mg/daily of Ibuprofen. She had been using Valium and Lortab as well. Sanchez had moved to Las Cruces and was to continue occupational speech[12] and physical therapy when she established a primary doctor. [Tr. at 320.]

On August 14, 1997, Dr. Iqbal, a neurologist, saw Sanchez for severe headaches, gait difficulties and left hearing loss. [Tr. at 218.] On August 18, 1997, she complained of headaches every day, dizziness, cognitive problems and blackouts. [Tr. at 221.] On August 20, 1997, Dr. Iqbal wrote that Sanchez was seen for chronic headaches and fainting. She was given a prescription for Elavil but she did not start it because she said it had not helped in the past. She was to start Doxepin and increase it. She was advised to cut down on the Valium and other medications. [Tr. at 217.]

_____

[11]The ALJ, in his first opinion, discounted Dr. Vega's opinion because he did not find that it was supported by objective medical evidence. The Magistrate Judge concluded that while Dr. Vega was Sanchez's treating physician, the ALJ articulated legitimate reasons for according little weight to this opinion.

[12]It never was clear from the records why Dr. Vega believed Sanchez needed speech therapy.

12

On September 22, 1997, Dr. Iqbal noted that she had recently started working in a floral shop and had stopped taking all of her medications. Sanchez was depressed and crying every morning. She was taking Motrin for headaches and had stopped taking Valium and Hydrocodone. She wondered if Prozac might help, and she was given a prescription to try. [Tr. at 216.] On September 25, 1997, Sanchez saw Dr. Flores regarding her headaches and cognitive dysfunction. [Tr. at 223.] She was very emotionally labile with acute tearfulness. She was easily frustrated with her children. Dr. Flores wrote that she was on Prozac for a mood disorder, "probably stress induced." [Tr. at 223.]

On October 7, 1997, Dr. Flores' notes show that Sanchez was awakening at night with anxiety. Her social life was a mess. She had a positive tox screen for marijuana which she said she used to relax her. Dr. Flores believed that her depression/anxiety were secondary to her social situation. She told the doctor she would not use marijuana or alcohol from that point forward. [Tr. at 223.] On October 15, 1997, she called for a renewed prescription of Prozac. She was out because she had doubled up on it on some days when she did not feel well. [Tr. at 222.]

On October 24, 1997, the first administrative law hearing was held. Her testimony during the first hearing was fairly consistent with the above described medical records and reports. [Tr. at 33-65.] On December 16, 1997, ALJ Vanderhoof denied the application for benefits. [Tr. at 18-26.]

In 1998, Sanchez saw Dr. Vega on a number of occasions for assorted complaints, including a mass on her neck that was excised and knee problems. [Tr. at 238, 240, 314.] Sanchez was on high doses of Ibuprofen for the headaches which continued and Hydrocodone. On October 14, 1998, she reported that Percocet helped with the headaches and that she took about ten pills per month. [Tr. at 304.] Sanchez had gone through an ENT exam and had a total sensory hearing loss in the

13

"right" ear.[13]  On November 12, 1998, she was seen by a physician after she had been to the ER for a syncopal episode on November 11, 1998.  She had passed out while sitting with her children.  She was placed on Xanax because a panic attack may have led to this syncope and hyperventilation.  The doctor was unsure of the cause.  [Tr. at 302.]

On December 10, 1998, Dr. Vega saw Sanchez and noted that Sanchez was taking Xanax that alleviated the panic.  Sanchez was managing with Ibuprofen for the headaches generally but needed to use 1-2 Percocet per week.  [Tr. at 300.]

In 1999, Sanchez continued to see Dr. Vega, but things seemed to improve for Sanchez.  In January 1999, she told Dr. Vega she was in school and that since starting Xanax, she felt much less anxious and was able to involve herself in school  She was enjoying herself and noticed the difference after starting the Xanax.  [Tr. at 297.]

On April 8, 1999, Sanchez reported that her headaches were tolerable.  She fought them off with Xanax with excellent relief.  She still occasionally had a breakthrough headache and used Percocet.  She was working at this time in the post office[14] but was unable to pass the G.E.D.  [Tr. at 294.]

On May 12, 1999, Sanchez was showering, lost consciousness and hit her head.  [Tr. at 292.] On July 26, 1999, Dr. Vega noted that Sanchez required one Percocet per day to control the headaches.  She managed well on Xanax alone.  If she continued to be anxious, however, Dr. Vega

_____

[13]Although a number of Dr. Vega's records refer to a right ear hearing loss for Sanchez, her loss appeared to have been in the left ear.

[14]This employment was not discussed by the ALJ, and it is unclear whether she worked at the post office for any significant period of time.

might try her on Paxil. [Tr. at 288.] There are no additional treating physician's records after this date, and by October 1999, Sanchez was working at the Buckhorn Tavern.

On August 27, 2001, the case was remanded to the ALJ. [Tr. at 253, 269.] On August 8, 2002, Dr. Rene Gonzales performed a psychiatric evaluation on Sanchez. [Tr. at 234.] At that time, Sanchez had been working for two years, 30 hours per week. In the last several years, Sanchez reported that she had felt fine. She was not depressed and was not taking any medications. She was pleased that she could work and that she was not dependent on the system. She stated that she functioned better when she was able to work. Her only problem was her left ear hearing loss. She had no psychiatric problems. She drank 3-4 beers on the weekend. Sanchez reported a DWI in 1995 but stated that she had never abused drugs. Her IQ appeared to be low-average. Dr. Gonzales assigned a GAF of 65 and found no limitations. [Tr. at 324.]

The second ALJ hearing was held on January 27, 2003. [Tr. at 327.] Sanchez was represented. On March 26, 2003, Judge Vanderhoof issued his decision which has been described above as to his findings. [Tr. at 245-53.]

## Discussion

In this appeal, Sanchez asserts that she is entitled to an immediate award of benefits or that the case should be remanded for a rehearing. She claims the ALJ made two errors: (1) the finding that nonexertional impairments did not impact her functioning was not supported by substantial evidence and was contrary to law; and (2) the ALJ's credibility finding was not supported by substantial evidence and was contrary to law. The Commissioner claims that the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations.

15

# I.     NON-EXERTIONAL IMPAIRMENTS

In the prior Magistrate's Proposed Findings and Recommended Disposition, that were adopted by the Court, the Magistrate Judge concluded that the ALJ Vanderhoof erred at step 2 by not finding Sanchez's mental impairments, including depression and borderline intellectual functioning, were severe.  On remand, the ALJ was specifically directed to include Sanchez's mental impairments in the RFC assessment.  [Tr. at 269.]

On remand, Judge Vanderhoof concluded that Sanchez's headaches, depression, anxiety and borderline intellectual functioning were severe impairments at step 2.  However, he also concluded that whether considered alone or in combination, they were not severe enough to meet a listing at step 3.  [Tr. at 247.]

Sanchez challenges whether, on remand, Judge Vanderhoof actually did consider her mental impairments as part of the RFC assessment, whether the ALJ's hypothetical to the VE reflected all of Sanchez's impairments, and/or whether there was substantial evidence to support the conclusion that Sanchez's nonexertional impairments did not impact her functioning.

The Tenth Circuit has stressed the crucial nature of a claimant's mental RFC.  *See* <u>Cruse v. United States Dep't of Health & Human Servs.</u>, 49 F.3d 614, 619 (10th Cir. 1995) ("When the listing requirements for mental disorders are not met, but the impairment is nonetheless severe, '[t]he determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity.'")  In assessing a claimant's mental RFC, the ALJ should consider the individual's ability to engage in the activities of daily living, to interact appropriately with the public, supervisors, and co-workers, to focus long enough to complete tasks in a timely fashion, and to adapt to stressful circumstances without either withdrawing from the situation or experiencing

increased signs and symptoms of the claimant's mental disorder. Tibbits v. Shalala, 883 F. Supp. 1492, 1499 (D. Kan. 1995).

Here, ALJ Vanderhoof discussed, in detail, why he concluded at step 3 that none of Sanchez's severe mental impairments met a listing level. He also noted that Sanchez did not have any marked limitations under the part B criteria for listing sections. At most, she had moderate restrictions of activities of daily living, social functioning, concentration, persistence, or pace, along with no evidence of repeated episodes of decompensation. [Tr. at 247-48.]

These part B criteria are not the equivalent of a RFC assessment. Kane v. Barnhart, 249 F. Supp. 2d 1252, 1255 (D. Kan. 2003). "[T]he ALJ must still perform a function-by-function assessment of an individual's restrictions pertaining to a mental RFC assessment." Id. (citing SSR 96-8p). When a mental impairment is alleged, the ALJ must assess the claimant's mental RFC in accordance with 20 C.F.R. § 416.945(c). That section requires the ALJ to assess the claimant's mental abilities of "understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting." 20 C.F.R. § 416.945(c). In contrast to the "paragraph B criteria" used to rate the severity of mental impairments at steps 2 and 3 of the process, the mental RFC assessment at steps 4 and 5 requires a more detailed assessment. Cox v. Apfel, 2000 WL 1472729 at *8 (D. Kan. Feb. 24, 2000).

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., eight hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

S.S.R. 96-8p.

It appears from Judge Vanderhoof's decision that he did note Sanchez's ability to engage in daily life activities, to maintain social functioning and to maintain concentration, at least with respect to discussing the part B criteria. [Tr. at 248.] However, he did not discuss Sanchez's ability to interact appropriately with the public, supervisors, and co-workers, to focus long enough to complete tasks in a timely fashion, and to adapt to stressful circumstances without either withdrawing from the situation or experiencing increased signs and symptoms of the claimant's mental disorder. Instead, he seemed to move directly from a discussion of the part B criteria to his conclusion that she had the RFC to perform a limited range of light work. [Tr. at 248-49.]

At page 6 of his opinion, the ALJ again referred to Sanchez's daily activities and the types of activities she stated she had been able to perform, at least in 1996. [Tr. at 250.] The ALJ's decision simply fails to incorporate any discussion of Sanchez's abilities to understand, remember and carry out instructions in a work setting, etc., as is required. Even if the ALJ's opinion could be read to provide the detailed assessment of Sanchez's RFC required at steps 4 and 5, the ALJ's assessment is not supported by substantial evidence.

This is true because the ALJ's conclusions regarding Sanchez's limitations and daily activities are continually drawn from 1996 records when it appeared that her condition had not deteriorated to the point it did in 1997 and 1998. [Tr. at 248, 249, 250.] In 1996, Sanchez did not have any medical appointments, except for a consultative exam and an eye exam. According to the disability forms she filled out then, she was still able to perform some of the activities she had been able to do prior to the December 1995 accident. However, in 1997, the objective medical records show that she was deteriorating and having more problems with her ability to perform her usual activities, and

18

more problems with dizziness, episodes of syncope, mood swings, memory, depression, anxiety, and severe and persistent headaches.

In a similar vein,[15] when Judge Vanderhoof indicated in his decision that Sanchez's anxiety and depression improved or responded well to medication, he drew on records and reports from 1999, when she finally seemed to be feeling significantly better – so much so, that near the end of 1999, she was able to hold down a job. An ALJ is not required to discuss every medical record. Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996). However, here Judge Vanderhoof appeared to selectively rely on records from 1996 and 1999, without resolving the conflicting evidence of more serious symptoms and complaints reflected in the 1997 and 1998 medical records. [Tr. at 250.]

The Court concludes, therefore, that the ALJ erred in not satisfying the procedural requirements for evaluating mental impairments, especially here where the case was remanded specifically so that Sanchez's mental limitations could be assessed at the RFC stage. In addition, the Court determines that substantial evidence does not support the ALJ's RFC finding.

## II.   CREDIBILITY DETERMINATION

At the end of Judge Vanderhoof's decision, in the "findings" section, the ALJ stated that he found "the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision." [Tr. at 252.] In reviewing the body of the decision, the Court does not locate a single reference to the term "credibility." The government argued that the ALJ "noted

_____

[15]The government's brief in opposition similarly emphasizes records from 1996 and 1999, and omits discussion of most of the 1997 and 1998 records. The government also cites to Dr. Rene Gonzales' consultative evaluation of Sanchez in 2002, that occurred after Sanchez had been able to hold her job for three years. At that time, Sanchez stated she was not depressed and feeling quite good. However, it does not necessarily follow from this 2002 record that Sanchez was able to work during the closed period in question.

the standards for evaluating subjective complaints" [tr. at 248] and that Judge Vanderhoof noted that the medical evidence and Sanchez's daily activities did not support her subjective limitations. [Tr. at 249-50.] Yet, after a careful examination of the ALJ's opinion, the Court locates little discussion of Sanchez's "subjective complaints" or of the ALJ's possible rejection or disbelief of those complaints.[16] In other words, the government appears to be reading in between the lines because the Court cannot find any reference by the ALJ indicating that he actually assessed and discounted Sanchez's credibility.

The Court agrees with the government's position that in reviewing an ALJ's credibility determinations, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." Casias v. Sec'y of HHS, 933 F.2d 799, 801 (10th Cir. 1991). "Credibility determinations are peculiarly the province of the finder of fact" and should not be upset when supported by substantial evidence. McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002) (internal quotation omitted). Nonetheless, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are not credible. See Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (quotation omitted). The Court also acknowledges that an ALJ is not required to conduct a formalistic factor-by-factor recitation of the evidence, provided he sets forth the specific evidence he relies on in evaluating the claimant's credibility. White v. Barnhart, 287 F.3d 903, 909 (10th Cir.

---

[16]The ALJ does tend to contrast some of Sanchez's testimony or statements made in 1996 to the later period in 1999, when she had started to feel much better.

2001). However, standard boilerplate language regarding credibility assessments will not suffice. Briggs ex rel. Briggs v. Massanari, 248 F.3d 1235, 1239 (10th Cir. 2001).

Here, the Court refuses to read in between the lines because there is no discussion by the ALJ of how he reached his credibility determination. Instead, his findings about credibility ring more like impermissible boilerplate language. The ALJ did not explain why specific evidence supported a conclusion that specific subjective complaints were not credible. Judge Vanderhoof discussed isolated statements by Sanchez as to her daily activities, yet he never actually stated that he discounted her statements or her complaints. This is not a case where the ALJ commented on Sanchez's subjective complaints and found that they were inconsistent with her daily activities. Nor did the ALJ expressly conclude that the record contained insufficient objective medical evidence to support Sanchez's complaints.[17] The Court determines that it cannot defer to the ALJ's credibility findings in this case because the findings were not "closely and affirmatively linked to substantial evidence." Therefore, the ALJ committed error as the credibility findings because he did not link his findings as required and the Court is unable to determine that substantial evidence supported his findings.

## III.  REMAND OR IMMEDIATE AWARD

The Court may choose to remand for further hearing or to remand for an immediate award of disability benefits. Ragland v. Shalala, 992 F.2d 1056, 1060 (10th Cir. 1993). "Outright reversal

---

[17]The sole exception is the ALJ's discussion that Dr. Eiselle stated she could not rule out malingering based on her evaluation of Sanchez in May 1997, and that Sanchez's complaints of depression or suicidal ideation in May 1997 were inconsistent with an earlier record in November 1996 when Sanchez apparently did not feel depressed or suicidal. Yet, Dr. Eiselle did not conclude that Sanchez was "malingering." She simply noted the possibility, and apparently could not confirm that possibility. Dr. Eissele also surmised that Sanchez might not have felt depressed or suicidal in 1996 and/or might not have felt comfortable revealing those feelings to the physician who handled the 1996 examination.

and remand for an immediate award of benefits is appropriate when additional fact finding would serve no useful purpose." Sorenson v. Bowen, 888 F.2d 706, 713 (10th Cir. 1989); Harris v. Sec'y of HHS, 821 F. 2d 541, 545 (10th Cir. 1987). *See also* Nielson v. Sullivan, 992 F.2d 1118, 1122 (10th Cir. 1993) (directing immediate award of benefits due to Commissioner's failure to follow regulations, claimant's advanced age, medical record supporting finding of disability and length of time case was pending).

This case has been pending for almost eight years. Two administrative hearings have been held and two decisions were issued. Sanchez already waited almost two years for the Appeals Council to resolve her request for review. Here, the Court sees no useful purpose in remanding for a third hearing to request that the ALJ again consider Sanchez's mental impairments in the RFC assessment, a directive that was already provided to the ALJ. Thus, the Court grants Plaintiff's motion and remands for a calculation of benefits for the closed period set forth by Plaintiff.

IT IS THEREFORE ORDERED that Plaintiff's Motion to Reverse and Remand for Payment of Benefits [Doc. No. 12] is GRANTED for the reasons stated herein, and that the matter is remanded for a calculation of benefits for the pertinent closed period.

Lorenzo F. Garcia
Chief United States Magistrate Judge